IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019 at Knoxville

**ANTONIO RICHARDSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04161          James M. Lammey, Judge**

_____

**No. W2019-00368-CCA-R3-PC**

_____

The petitioner, Antonio Richardson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. The petitioner also challenges the constitutionality of Rule 13 of the Tennessee Supreme Court Rules, claiming the post-conviction court erred in its adherence to the same. Following our review, we affirm the denial of the petition and the post-conviction court's application of Rule 13.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and D. KELLY THOMAS, JR., J., joined.

Robert Golder, Memphis, Tennessee, for the appellant, Antonio Richardson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

A Shelby County jury convicted the petitioner of first degree premeditated murder for which the trial court imposed a life sentence. In denying the petitioner's direct appeal claims, this Court summarized the evidence presented at trial, as follows:

> This case arises from an August 16, 2014 shooting in which Andrew Wooten, also known as Woo, sustained multiple gunshot wounds while

inside his car and died as a result of his injuries. At the trial, Teresa Wooten, the victim's sister, testified that she last saw the victim two days before the shooting. She said that she had never heard of the [petitioner] before the victim's death but said her daughter and the [petitioner] were Facebook friends around the time of the shooting. Ms. Wooten said that her daughter showed Ms. Wooten the [petitioner's] Facebook page. Ms. Wooten identified a photograph depicting the [petitioner] standing behind a black SUV and said this photograph was posted on the [petitioner's] Facebook page. Ms. Wooten said that she called the police after viewing the photograph and showed the photograph to police officers. Ms. Wooten stated that in 2012, the victim was accused of shooting the [petitioner], although she did not witness the shooting.

Memphis Police Lieutenant Derrick Williams testified that on July 18, 2012, he investigated a shooting incident in which the [petitioner] was the victim. Lieutenant Williams stated that he called the [petitioner] and asked what occurred and that the [petitioner] reported a man identified as Woo "ran in his house on him." Lieutenant Williams said that the [petitioner] did not want to prosecute and that the file was closed. He said that although he asked the [petitioner] to sign a refusal to prosecute form, no form was signed.

On cross-examination, Lieutenant Williams testified that the telephone number he used to contact the [petitioner] was provided to him by the officer who responded to the crime scene. He agreed he had never spoken to the [petitioner] before the 2012 incident.

Taylor Newton testified that he worked at Thompson Court Apartments at the time of the 2014 shooting and that he was the assistant property manager tasked with security oversight. He said that security cameras were positioned on the main office building, that the cameras recorded the shooting, and that the police obtained a copy of the recording, which was received as an exhibit. On cross-examination, Mr. Newton testified that he was unsure whether an employee of the apartment complex continuously watched the security cameras.

Memphis Police Officer James Fort testified that he obtained the surveillance video recording from the apartment complex. Although the recording was played for the jury, it is not contained in the appellate record.

Laquinta Davis testified that she lived at the apartment complex on August 16, 2014. She said that at the time of the shooting, she was on her back porch watching neighborhood children play football and that she saw a black SUV drive around the area twice before stopping near her apartment. She said that she heard gunfire and that the [petitioner] got out of the driver's door of the SUV, ran toward another car, and continued shooting to "finish off" the victim. She said that the gun was a semi-automatic handgun. She said that she heard a two-second pause during the shooting, which she described as the time it took for the [petitioner] to "get close enough . . . and then finish" shooting at the victim. She said that she heard about nine gunshots and that the [petitioner] returned to his SUV and drove away. She said that she called 9-1-1, that the dispatcher asked her to determine whether the victim was breathing, that she walked to the car, and that the victim was not breathing. She saw bullet holes in the victim's back and said the victim was "slumped over" to the side.

Ms. Davis identified the surveillance recording from the apartment complex and said that the recording accurately reflected her testimony. She said that although several people walked toward the victim's car after the shooting, nobody got inside the car. She said that she did not see any weapons in the victim's hands or inside the car and that she did not see anything to indicate shots were being fired from the victim's car. She said that she had never seen the [petitioner] before the shooting and that she did not know the victim.

On cross-examination, Ms. Davis testified that she did not know any of the people who walked toward the victim's car after the shooting, that she did not know Charles Dowdy, and that she moved to the apartment complex about one month before the shooting. She agreed that after the people walked toward the victim's car, she turned away from the victim's car and toward the main office while she spoke to the 9-1-1 dispatcher.

Laquilshay Brown testified that she had lived at the apartment complex about seven months at the time of the shooting. She said that on the day of the shooting, she and a friend were returning to her apartment. She said that from inside her friend's car, she heard gunshots and saw the [petitioner] drive past her friend's car while shooting a gun at someone. She said the [petitioner] stopped shooting, got out of his black SUV, allowed her friend to drive past the area, walked toward the victim, and continued shooting. She said that she was about ten feet from the [petitioner] when he allowed her friend to drive away from the area. She

said the victim was inside a car when the shooting began and was slumped over when her friend drove away.

Charles Dowdy testified that he lived at the apartment complex at the time of the shooting, that he knew the victim, and that the victim's nickname was Woo. Mr. Dowdy said the victim came to his apartment around 2:00 or 3:00 p.m. before the shooting and stayed about twenty minutes. Mr. Dowdy admitted the victim bought one pound of marijuana for $1,000 and left. After he saw the victim drive away in a gold or greenish Mazda, Mr. Dowdy returned to his apartment. Mr. Dowdy said that he stepped outside his apartment again and heard gunshots. He said that although he did not see anyone shooting a gun, he saw a black SUV driving away. He said that he did not see the driver but that he knew the SUV belonged to the [petitioner] because it had been parked across the street from Mr. Dowdy's apartment previously.

Mr. Dowdy testified that he reviewed the surveillance recording and that he saw the [petitioner's] SUV leaving the crime scene. He said that in the recording, someone got out of the black SUV and walked toward the bushes. Mr. Dowdy said the person would have been able to see vehicles leaving the parking lot from the bushes.

Mr. Dowdy testified that the victim did not have a weapon when the victim came to his apartment. Mr. Dowdy admitted that he had been convicted of selling marijuana and that he was serving a sentence on probation at the time of the trial. He agreed he provided a police statement before receiving probation and that the prosecutor in his case had not promised leniency in exchange for his testimony in the present case.

On cross-examination, Mr. Dowdy testified that he had previous drug-related convictions and a conviction for altering, falsifying, or forging an automobile title or license plate. He said the victim did not live where the shooting occurred, although he thought the victim lived at the apartment complex. He said the drug transaction occurred in the victim's car. He denied selling the victim "pills" or cocaine and placing or removing anything from the victim's pockets. Mr. Dowdy said that after the victim drove away, he heard gunshots, that he ran, that he heard additional gunshots, that he got inside his car, that he attempted to drive away, and that he saw the victim's wrecked car. Mr. Dowdy said that he stopped his car, got out, and walked to the victim's car. Mr. Dowdy said that he yelled

- 4 -

the victim's name, that he returned to his car, that he drove away, and that he returned to his apartment.

Shelva Stafford, Shelby County Clerk's Office records custodian, testified that the [petitioner] was the registered owner of a black Pontiac Aztec. She identified the license plate and VIN numbers. She agreed the last three digits of the license plate number matched the last three digits of the license plate visible in the photograph identified by Ms. Wooten.

Memphis Police Officer Brandon Westrich testified that he responded to the crime scene and that the deceased victim was slumped inside the victim's car with visible gunshot wounds. He did not recall whether the doors on the victim's car were open but said nobody was inside the car. He secured the scene and said he looked for cartridge casings and other evidence in the area. He did not see any weapons inside the car but saw marijuana on the front passenger floorboard. On cross-examination, Officer Westrich stated that he saw bystanders when he arrived at the crime scene but that nobody was "directly in the crime scene."

Chief Medical Examiner Karen Chancellor, an expert in forensic pathology, testified that the victim suffered four gunshot wounds to the left shoulder, back, and head. She said that one of the bullets fractured the left clavicle, that a second bullet damaged the left lung and heart, causing internal bleeding, and that a third bullet damaged the left lung, liver, and spleen. A fourth bullet struck the victim's skull, causing a fracture, but did not injure the brain. She concluded that either the second or third bullets could have caused the victim's death because of the damage to the victim's organs. The victim's toxicology report showed the presence of marijuana. She concluded that the cause of death was multiple gunshot wounds.

On cross-examination, Dr. Chancellor testified that at the time of the autopsy, a bag containing a green leafy substance, a bottle containing pills, one bag containing a white powder, one bag of white pills, a single $100 bill, two $10 bills, seventeen $1 bills, twenty-six $20 bills, and five $5 bills were collected from the victim's body. She did not perform any analyses on the white power.

Memphis Police Officer Jeffrey Garey testified that he collected evidence at the scene. He recovered seventeen FC nine-millimeter cartridge casings. Photographs of the victim's car showed seven "circular defects" on the rear driver's side, circular defects on the front driver's door

and front fender, broken and shattered front driver's and passenger-side windows, and three circular defects in the front driver's seat. A single photograph showed the victim inside the car leaning toward the center console and front passenger seat and with three circular defects in his upper left shoulder and back. Officer Garey said that one cartridge casing was found on the hood of the victim's car and that three casings were found in "fairly close proximity" to the car. Officer Garey said no weapons or ammunition were found inside the victim's car.

Tipton County Sheriff's Detective Brandon Matlock testified that on September 17, 2014, he obtained a search warrant for the black Pontiac Aztec matching the license plate and VIN numbers previously identified. Detective Matlock said that the SUV was registered to the [petitioner]. Detective Matlock and Memphis Police Sergeant Gaylor and another officer searched the SUV. A photograph of the SUV's interior showed an identification badge reflecting the [petitioner's] name and photograph. Detective Matlock said other items were seized from the SUV, including a grey hooded sweatshirt and red and black work gloves.

Memphis Police Officer Michael Coburn testified that he processed the victim's car. He said that the circular defects were possible bullet holes and that nine circular defects were found on the rear of the driver's seat and on the front passenger seat. He said that twelve circular defects were found on the outside of the car. He said that bullet projectiles were found on the left rear floorboard and in some clothing after it was removed from the back seat. He identified two projectile fragments found on the right rear floorboard and inside the front right door handle. He identified a baseball cap found inside the car with two circular defects and said broken window glass was found inside the car. He said no cartridge casings, unfired ammunition, or weapons were found inside the car. He attempted to obtain latent fingerprints from the car, but none were found.

Officer Coburn testified that he processed the [petitioner's] Pontiac Aztec, that no weapons or cartridge casings were found inside the SUV, and that no circular defects were found inside or outside the SUV. He did not attempt to obtain latent fingerprints.

On cross-examination, Officer Coburn testified that the green leafy substance found inside the victim's car was later identified as marijuana, which weighed 455.8 grams. He agreed he obtained one fingerprint on the bag containing the marijuana and said the fingerprint was forwarded to the

latent fingerprint examiners. On redirect examination, he agreed that the multiple circular defects found on the victim's car were possible bullet holes and that he found no similar markings on the [petitioner's] SUV.

Tipton County Sheriff's Deputy Jeffrey Thompson, Sr., testified that on September 16, 2014, the United States Marshals Service apprehended the [petitioner] in Covington.

Memphis Police Sergeant James Sewell testified that he responded to the scene of the shooting and that the victim had clear plastic sandwich bags in his pants pocket. He said the bags were commonly used to sell drugs. He agreed he also saw an unmarked pill bottle containing several unidentified white pills. He did not see any weapons or ammunition inside the car or on the victim's body.

Brenda Lee, apartment manager and records custodian for Thompson Court Apartments, testified on behalf of the defense that the [petitioner] and Anthony Williams leased an apartment on January 17, 2014. She said Mr. Williams lived in the apartment on August 16, 2014.

Dominique Harris, the victim's niece and the [petitioner's] cousin, testified that in July 2012, the [petitioner] and the victim were in an altercation. She said that someone "broke up" the fight inside an apartment at Hillview Village, that the victim ran upstairs, that the victim obtained a gun, and that the victim returned with a gun and shot the [petitioner]. She recalled that multiple people, including children, were present and said that everyone "scattered" after the victim obtained the gun. She said the [petitioner] also ran because everyone knew the victim went inside to obtain a gun. She said that she and the [petitioner] ran downstairs, that the [petitioner] suffered a gunshot wound to the leg, and that the [petitioner] escaped through a bedroom window. She said she heard the victim say, "Man, you think it's a game," just before the gun fired twice. On cross-examination, Ms. Harris stated that she and the [petitioner] never spoke about the shooting and that she did not know the [petitioner] refused to prosecute the victim.

The [petitioner] testified that in 2012, the victim shot him. The [petitioner] explained,

[T]here was a stabbing that happened between Ms. Helen and my sister. I came back from the basketball court

- 7 -

and I saw that, so I knew [the victim] from the park and I told him about this, I told him . . . what had happened. I came around and I asked him what happened and what was going on and he stowed off on me and hit me and we got into an altercation.

The [petitioner] said that after the fight, the victim ran upstairs, obtained a gun, found the [petitioner], and shot him in the leg. The [petitioner] said that he held up his hands and asked the victim not to shoot him. The [petitioner] said that the victim ran away after the shooting, that "Helen's brother" was "coming back . . . to try to finish it off," and that he and Ms. Harris escaped through a window. He said that he obtained treatment at the hospital, that he only spoke to the police at the scene before he left in an ambulance, and that he told the officer the victim shot him.

The [petitioner] testified that he lived at the apartment complex where the shooting in the present case occurred and that he shot the victim because he feared for his life. The [petitioner] said that on the day of the shooting, he returned home after driving his sister to her home and saw the victim and Mr. Dowdy standing near the [petitioner's] apartment. The [petitioner] recalled an unrelated confrontation with Mr. Dowdy the day before the shooting and said the incident related to his and Mr. Dowdy's nieces. The [petitioner] said he attempted to speak to Mr. Dowdy and Mr. Dowdy's father to persuade Mr. Dowdy's father to calm Mr. Dowdy. The [petitioner] said that when he went to talk to Mr. Dowdy's father, "they [were] already loading up, like they was fixin [sic] to get ready to come down there and shoot up my apartment." The [petitioner] said,

So they saw my face and they say, they had knew me, so I guess they were . . . squashing it and stuff . . . for whatever reason like that. But, you know how it is, [Mr. Dowdy], he will say something and he got to do something else, like get somebody to try to take you out, or something like that.

The [petitioner] said that he thought the matter was resolved but that when he saw Mr. Dowdy and the victim the next day standing across the street from the [petitioner's] apartment, he was unsure what was happening. The [petitioner] said that he drove his SUV around the area, parked, got out, and approached Mr. Dowdy and the victim. The [petitioner] said that he asked the men what was happening and that the victim said, "If you

don't get away from around here [,] I'm going to blow [your] a[**] off."
The [petitioner] said he returned to his SUV, thinking about the victim's
shooting him previously.

The [petitioner] testified that he had owned the gun he used to shoot
the victim since the victim shot him two years previously. He said that
while he was sitting in his SUV, he thought the men were going to shoot at
him and that he needed to protect himself. He said that he backed up his
SUV in the event the men attempted to shoot at him first, that he got out,
and that he began shooting first because he thought the victim was going to
kill him. He said he did not drive away because he lived at the apartment
complex and because he was shot the last time he ran from the victim. He
said he did not call the police immediately after the shooting and recalled
feeling "a rage." He said he did not go to his apartment because he feared
"they" would hurt him.

On cross-examination, the [petitioner] testified that he did not speak
to Lieutenant Williams about the victim's shooting him in 2012. He said
that he was upset about the victim's shooting him but that he "let it go." He
denied wanting "street justice." The [petitioner] said that Mr. Dowdy did
not live in the apartment Mr. Dowdy identified and that Mr. Dowdy did not
live across the street from him. The [petitioner] agreed that he parked his
SUV behind a bush on the day of the shooting but denied he backed up to
ensure the victim could not see him coming around the building. He said
he was not afraid of the victim until the victim threatened him.

The [petitioner] agreed that he saw the victim drive around the
corner, that the [petitioner] began firing his gun, and that no gunshots were
fired from the victim's car. He did not know whether the victim had a gun
but said the victim had threatened him and was driving toward him. He did
not know how many shots he fired at the victim's car and said he was "in a
rage." He agreed he ran to his SUV when the shooting ended. He did not
know why he did not call the police after the shooting and denied knowing
the police were looking for him.

The [petitioner] testified that he was not "waiting to get [his]
chance" because he had seen the victim numerous times since the 2012
shooting. He said he used a nine-millimeter handgun to shoot the victim
and said he sold it to the original owner afterward. He agreed he denied
shooting the victim until he saw the surveillance recording from the

apartment complex. He said later, though, that he did not know he had shot the victim until he saw the recording and that he was shocked.

On redirect examination, the [petitioner] testified that he had to "get" the victim before the victim "got" him. He said that he needed to shoot the victim before the victim hurt him again. He said that he took seriously the victim's threat to "blow [the petitioner's] a[**] off."

*State v. Antonio Richardson*, No. W2016-00340-CCA-R3-CD, 2017 WL 571520, at \*1-6 (Tenn. Crim. App. Feb. 13, 2017), *perm. app. denied* (Apr. 13, 2017).

The petitioner timely filed a pro se petition for post-conviction relief. In the petition, the petitioner argued trial counsel was ineffective for pursuing a theory of self-defense rather than insanity, for failing to fully investigate an insanity defense, and for failing to obtain a mental evaluation regarding the petitioner's competency to stand trial or to support an insanity defense. The petitioner further alleged trial counsel was ineffective for failing to interview homicide detective Fausto Frias and for failing to object, for various reasons, to several of the witnesses called by the State, including: Teresa Wooten, Lieutenant Williams, Laquinta Davis, Laquilshay Brown, Charles Dowdy, Shelva Stafford, Officer Westrich, Dr. Chancellor, Officer Garey, Detective Matlock, Officer Coburn, Sheriff's Deputy Thompson, and Sergeant Sewell. The petitioner also asserted trial counsel was ineffective for failing to file motions to dismiss the indictment, for a mistrial, or for a judgment of acquittal. Finally, the petitioner argued appellate counsel was ineffective for failing to challenge the admissibility of the photographic evidence entered by the State as a violation of Rule 403 of the Tennessee Rules of Evidence.

In an amended petition filed by appointed counsel, the petitioner again argued trial counsel was ineffective for failing to secure a mental health evaluation to determine the petitioner's sanity at the time of the murder and his competency to stand trial. The petitioner, his mother, and trial counsel testified at the evidentiary hearing.[1]

The petitioner's mother, Josephine Smith, explained the petitioner struggles with comprehension, has a short attention span, and was diagnosed with ADHD, mental depression, bipolar disorder, and schizophrenia. The petitioner was treated at Whitehaven Mental Health Center for these conditions, but his health records were destroyed. Ms. Smith stated Dr. Thomas at Whitehaven Mental Health Center told her

---

[1] At the outset of the hearing, the petitioner asked the post-conviction court to remove appointed counsel and provide him with a new attorney. The trial court refused to do so, and the petitioner proceeded with appointed counsel.

that the petitioner will "go in a rage" after which he will not remember what happened. Though trial counsel never asked, Ms. Smith told trial counsel about the petitioner's mental health issues.

Ms. Smith provided additional details regarding the petitioner's medical and social history, including that he received Social Security Disability benefits for "[t]he way he act out," a learning disability, and manic depression. She also noted the petitioner made poor grades while attending special education high school classes. According to Ms. Smith, the petitioner had trouble reading and was often suspended from school for his behavior. For example, the petitioner would get angry and throw things, but when Ms. Smith asked him about his behavior, the petitioner would not remember doing it. Doctors prescribed medication for the petitioner but told Ms. Smith to expect this behavior. Though Ms. Smith could not remember all of the medicines prescribed to the petitioner, she generally stated he behaved better while on medication. Ms. Smith also did not specifically remember the petitioner scoring 90 on an IQ test or passing hearing and vision tests while in school. Upon questioning by the post-conviction court, Ms. Smith confirmed the petitioner maintained a driver's license, two jobs, and graduated from a special education high school program.

Regarding the petitioner's present conviction, Ms. Smith explained the petitioner did not realize or remember that he killed the victim despite the video depicting the murder. However, she acknowledged the petitioner provided detailed testimony regarding the murder during trial. Ms. Smith noted she did not want the petitioner to testify based upon his mental health conditions, but she knew the petitioner wanted to explain that he did not remember killing the victim. Ms. Smith was unaware that since being incarcerated, the petitioner has been treated for his mental health issues.

The petitioner then testified, generally stating trial counsel failed to adequately investigate his case. The petitioner complained trial counsel did not discuss the theory of self-defense with him prior to trial and further noted he did not agree with this strategy. Rather, the petitioner thought the defense's strategy would be to seek a verdict for a lesser-included offense like voluntary manslaughter or second degree murder. The petitioner was also unsatisfied with trial counsel for not pursuing an insanity defense. However, when asked what trial counsel should have done to fully investigate a defense of insanity, the petitioner offered nothing. The petitioner did not believe trial counsel researched his school or medical history, and he did not remember if trial counsel questioned him about the same during his testimony. He also did not remember undergoing any mental health evaluations or the results of the same. The petitioner denied exaggerating his mental health conditions.

The petitioner further stated he did not want to go to trial but he was not offered a plea deal. During trial, the petitioner did not think trial counsel fought for him as she believed the petitioner killed the victim. Turning to more specific complaints from trial, the petitioner asserted trial counsel should have made a hearsay objection during Teresa Wooten's testimony and detailed the reasons as to why he thought the crime scene was contaminated. According to the petitioner, "they" moved the victim's body and placed a blanket over the victim before paramedics arrived. In addition, the petitioner claimed some of the witnesses removed a gun from the victim's car before the police arrived. The petitioner stated trial counsel failed to highlight the crime scene contamination issue during trial, but noted he discussed the issue during his testimony. He did not remember any witnesses denying that the victim had a gun during trial.

Further, regarding his trial testimony, the petitioner explained he did not initially intend to testify, but as the trial ensued, the petitioner felt he needed to tell his story to show the jury he was not the "monster" the State made him out to be. The petitioner acknowledged trial counsel advised him against testifying. During his testimony, the petitioner stated the victim had a gun, the victim threatened him, and the victim told the petitioner "he was going to blow my a** off." The petitioner also testified he "blanked out" during the shooting.

During cross-examination, the petitioner agreed he received discovery but claimed trial counsel did not discuss it with him. The petitioner, however, admitted he watched the video of the murder with trial counsel and acknowledged it showed him shooting the victim. The petitioner stated trial counsel did not advise him on how to explain the shooting during his testimony and continued to assert that trial counsel failed to gather his medical records and failed to pursue an insanity defense. He did not remember taking any tests or meeting with Dr. John Worley or Dr. Lynne Zager about his mental health, claiming "[n]obody came and talked to me about nothing."

Regarding his background, the petitioner acknowledged that he previously received Social Security Disability benefits though he did not know why, that he was suspended from high school for his attitude, and that he was kicked out of vocational classes for his behavior. Despite these issues, the petitioner graduated from high school, maintained numerous jobs, had a driver's license, and lived independently. At the time of the shooting, the petitioner was taking Percocet for a physical injury to his head unrelated to his mental health issues, noting he no longer has insurance coverage.

During redirect examination, the petitioner explained when he blacks out everything goes dark and he does not know what happened. He further noted he decided to testify during a recess at trial when he was "hearing voices" and he had to "let them know that I wasn't no monster like they trying to make me out to be." The petitioner

stated he was currently taking Venvage for his mental health issues though he could not remember his diagnosis. Finally, during re-cross examination, the petitioner stated he graduated from a welding class while in jail and began taking medicine for the anxiety he has experienced since being incarcerated. As of October 4, 2018, the petitioner felt his symptoms were under control and the medicine was helping him.

Trial counsel also testified. At the outset of her representation, trial counsel watched the crime scene video and noted it clearly depicted the petitioner shooting the victim.[2] After meeting with the petitioner and realizing he "had some mental delays," trial counsel decided to incorporate mental health into the petitioner's defense and detailed her investigation into the petitioner's social and medical history. She learned the petitioner struggled with reading and communicating and learned he attended special education classes in high school. Accordingly, trial counsel gathered as much information as she could about the petitioner's mental health and intellectual disability as well as his school and psychological testing records. The petitioner's school records indicated he had low testing scores in math and reading but an average IQ of 90. Trial counsel presented the petitioner's records to the doctors at West Tennessee Forensics and discussed the petitioner's background with his mother.

Trial counsel then sought testing through the court in order to fully investigate all of the potential defenses available to the petitioner based upon his competency and mental health. She explained that over the course of several months the Tennessee Department of Disability Services conducted numerous tests on the petitioner. The initial testing revealed the petitioner "was presenting himself as more impaired than he actually is." As a result, trial counsel sought additional testing from another doctor. However, after additional testing, the doctors again opined the petitioner was malingering. Trial counsel also began noticing instances where the petitioner exaggerated his mental health condition. For example, the petitioner initially told her that he had no idea why he was charged with first degree murder. Even after showing the petitioner the video of him shooting the victim, the petitioner continued to maintain he knew nothing about the shooting. As a result, trial counsel showed the video to the petitioner's family in order to extinguish their belief that the petitioner was charged with a crime for no reason.

Absent any medical or clinical support, trial counsel did not feel she could pursue a defense based upon insanity or competency. Instead, trial counsel decided to pursue a theory of self-defense. She learned the victim shot the petitioner in 2012 and believed she could reasonably argue the petitioner would have been frightened to see the victim at the petitioner's apartment complex. Trial counsel believed she could argue the petitioner

---

[2] Though the petitioner was represented by two attorneys at trial, only one testified at the evidentiary hearing. As such, our focus pertains to the actions of testifying counsel.

"became so afraid that [the victim] was coming back, you know, to finish the job. And that that's why [the petitioner] shot." In support, trial counsel presented testimony from witnesses to the 2012 shooting, including the responding police officer and his report.

Regarding the petitioner's trial testimony, trial counsel explained both she and co-counsel advised the petitioner against testifying because of his poor communication skills and his tendency to forget, or say he has forgotten, information. The petitioner, however, wanted to testify. Trial counsel did not think the petitioner's testimony aided their defense as he was not prepared and either was or seemed confused. She noted several inconsistencies in the petitioner's testimony, including that the petitioner stated he blacked out during the shooting but then was able to detail his actions before the shooting, including that the victim threatened him.

Trial counsel next addressed the petitioner's issues regarding her handling of Teresa Wooten's testimony. The petitioner complained trial counsel did not object to Ms. Wooten's uncorroborated testimony regarding her identification of the petitioner through Facebook. Trial counsel, however, noted identity was not an issue as the crime scene video clearly showed the petitioner shooting the victim. Accordingly, she did not believe challenging the petitioner's identity as the shooter would have been fruitful.

Trial counsel also explained her strategy in suggesting that the crime scene was contaminated, noting she highlighted portions of the crime scene video that showed people approaching the victim and looking in his car. Through this evidence, trial counsel hoped to suggest that someone might have taken a gun out of the victim's car before police arrived.

During cross-examination, trial counsel stated she met with the petitioner numerous times to discuss the discovery in his case and to watch the crime scene video. She then provided additional details regarding her decision to pursue self-defense, rather than a mental health defense. Trial counsel stated Investigator Gloria Shettles, who is experienced in obtaining mitigating evidence in capital cases, investigated the petitioner's mental health and school records while the case was in general sessions. Based upon Ms. Shettles's initial investigatory efforts, trial counsel began to pursue a mental health defense by requesting a mental health evaluation in search of evidence to support either an insanity defense or a defense based upon diminished capacity. The petitioner also underwent a competency training before Dr. Worley opined the petitioner was malingering or exaggerating his symptoms. Trial counsel petitioned for another mental health evaluation based upon the records she obtained and her recognition of the petitioner's communication issues. Dr. Lynn Zager performed the second evaluation and also concluded the petitioner was competent and nothing supported a diminished capacity or insanity defense. Based upon these results, trial counsel stopped pursuing a mental

health defense and explained to the petitioner why they could not pursue the same, both privately and in open court.

Trial counsel then turned to a theory of self-defense after learning of the prior shooting between the victim and the petitioner. She explained the video alone did not support the theory of self-defense, but she thought the defense was possible given the relationship between the victim and the petitioner and the fact that the victim was at the apartment complex to buy drugs prior to his death. Based upon this evidence, trial counsel believed it was reasonable to suggest the victim likely had a gun with him even though no evidence of a gun existed. Trial counsel fully explained the self-defense theory to the petitioner.

Regarding the petitioner's tendency to forget certain information, trial counsel believed the petitioner had cognitive delays, but she "felt like [the petitioner] would remember things when he wanted to remember and not remember when it wasn't good for him. . . . When it was negative, he just didn't remember it." Though trial counsel did not find any of the State's cross-examination of the petitioner to be inappropriate, she stated because the petitioner has communication issues he may have been confused by some questions which may have seemed evasive to the jury. Generally, however, trial counsel believed the petitioner understood the questions asked of him.

Trial counsel further noted she was shocked when the petitioner decided to testify at the end of trial. However, because the petitioner insisted, trial counsel tried to prepare him as best she could by conducting a mock cross-examination. Despite her efforts, trial counsel did not believe the petitioner presented well to the jury or provided helpful testimony. Trial counsel recalled portions of the petitioner's testimony that hurt their self-defense theory, including that the petitioner was not afraid of the victim, that he waited for the victim prior to the shooting, and that he was in a rage at the time of the shooting. Trial counsel believed a jury might have accepted their theory of self-defense until the petitioner testified.

After reviewing the evidence presented, the post-conviction court denied relief. This timely appeal followed.

### *Analysis*

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual

issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

- 16 -

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner argues trial counsel did not pursue "all reasonable avenues of defense relating to [his] mental illness" which prohibited trial counsel from requesting a jury instruction on diminished capacity. The petitioner asserts an instruction on diminished capacity would have negated the mens rea requirement of first degree murder and would have led the jury to return a lesser-included verdict. The State contends trial counsel made a strategic decision to pursue a defense of self-defense after reviewing the petitioner's school and mental health records and obtaining two mental health evaluations prior to trial. Upon our review, we agree with the State.

At the evidentiary hearing, trial counsel explained that after meeting with the petitioner and speaking with his mother, she believed he suffered from cognitive delays. As a result, trial counsel began investigating the petitioner's school, medical, and psychological testing records in order to determine if she could pursue a defense based upon the petitioner's mental health. Relying upon an initial investigation conducted by Gloria Shettles, trial counsel learned the petitioner had trouble with reading and comprehension and took special education classes in high school. Trial counsel then obtained a court-ordered mental health evaluation to determine if she could gather medical evidence to support a defense based upon diminished capacity or insanity. The initial report by Dr. Worley, however, did not support either and suggested the petitioner was exaggerating his mental health condition. Met with this roadblock, trial counsel petitioned the trial court for a second mental health evaluation based upon her belief that the petitioner suffered from mental health issues. However, the second mental health evaluation, performed by Dr. Zager, also did not support any defenses based upon the petitioner's mental health and further suggested the petitioner was malingering. Absent any medical evidence to support a defense based upon the petitioner's mental health, trial counsel decided to pursue a theory of self-defense after learning the victim shot the petitioner in 2012.

The petitioner suggests trial counsel was ineffective for failing to obtain relevant school and medical records, an independent mental health evaluation, or an independent expert to support a defense based upon his mental health. The record, however, demonstrates trial counsel used an investigator to obtain the petitioner's school and medical records, she discussed the petitioner's mental health history with his mother, and she secured two mental health evaluations in order to identify any possible defense theories she could advance based upon the petitioner's mental health. When trial counsel learned there was no medical evidence to support such a defense, she chose to pursue a theory of self-defense instead, believing she could reasonably argue the petitioner feared

- 17 -

the victim based upon their history. Nothing in the record indicates trial counsel's strategy was not sound, and simply because trial counsel's strategy was unsuccessful does not render her assistance ineffective. *See Strickland*, 466 U.S. 689; *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). The petitioner has failed to show how trial counsel's pre-trial efforts to pursue a defense theory based upon the petitioner's mental health constituted ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694. The petitioner is not entitled to relief.

We also note that the petitioner failed to present an expert during the post-conviction hearing in order to show that "[i]f trial counsel had obtained funding for an independent expert to evaluate [him] at the trial stage, even if the expert found [the] [p]etitioner to be competent, trial counsel could still have pursued a defense of diminished capacity." Absent expert testimony to support his claim, the petitioner cannot establish prejudice and he is not entitled to relief. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

The petitioner, however, addressed this issue both at the evidentiary hearing and in his brief, arguing the post-conviction court erred in refusing to provide him with funds to obtain an expert prior to the evidentiary hearing pursuant to Rule 13 of the Tennessee Supreme Court Rules. The petitioner challenges the constitutionality of Rule 13 as a violation of both the class legislation clause of the Tennessee Constitution and the equal protection clause of the United States Constitution.[3] U.S. Const. amend. XIV; Tenn. Const. art. XI, § 8. The petitioner's challenge, however, is without merit as Rule 13 clearly provides that "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. R. Sup. Ct. 13 § 5(a)(2); see *Davis v. State*, 912 S.W.2d 689, 695-97 (Tenn. 1995); *Rutherford v. State*, No. E1999-00932-CCA-R3-PC, 2000 WL 246411, at *18 (Tenn. Crim. App. Mar. 6, 2000) (quoting *Davis*, 912 S.W.2d at 696-97) ("Neither due process nor equal protection requires the state 'to provide expert services to indigent non-capital post-conviction petitioners.'"). Accordingly, the post-conviction court properly denied the petitioner's request for expert funds, despite his indigency, as he is not facing capital punishment. The petitioner is not entitled to relief.

---

[3] Citing *State v. Adkisson*, the State argues the petitioner has waived his challenge to the constitutionality of Rule 13 as a violation of the class legislation clause because he is advancing this theory for the first time on appeal. 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). We, however, will address the merits of the claim.

*Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____

J. ROSS DYER, JUDGE